FILED
CLERK, U.S. DISTRICT COURT
3/27/2018
CENTRAL DISTRICT OF CALIFORNIA
BY: \_\_\_\_BH\_\_\_\_ DEPUTY

rf

**United States District Court**
**Central District of California**

North Atlantic Operating Company, Inc., et al.,

    Plaintiffs,

v.

LA Price Check, LLC, et al.,

    Defendants.

CV 17-5920-VAP (AFMx)

**Order Granting Plaintiffs' Motion for Contempt (Doc. No. 67)**

    Plaintiffs North Atlantic Operating Company, Inc. and National Tobacco Company, L.P. (collectively, "Plaintiffs") filed a Motion to Hold Defendants Shaukat Rajani and New Rainbow, Inc. in Civil Contempt for Violating the Agreed Final Judgment and Permanent Injunction Entered by the Court ("Motion") on December 19, 2017. (Doc. No. 67.) Defendants Shaukat Rajani and New Rainbow, Inc. (collectively, "Defendants") did not file an opposition. On February 5, 2018, the Court held a hearing on this Motion and ruled from the bench that there was clear and convincing evidence that Defendants violated the December 12, 2002 injunction and held Defendants in contempt. (Doc. No. 79.) Remaining at issue was what sanctions were appropriate in light of the contempt finding.

    The Court thus ordered further briefing regarding sanctions and addresses this issue in this Order. On March 1, 2018, Plaintiffs filed a Supplement to their Motion regarding sanctions ("Supplement" or "Suppl.").

(Doc. No. 91.)[1]  Defendants timely opposed Plaintiffs' Supplement on March 12, 2018.  (Doc. No. 93 ("Opposition").)[2]

After considering the papers filed in support of and in opposition to the Supplement, as well as Plaintiffs' Motion and oral argument on February 5, 2018, the Court rules as follows.

## I. BACKGROUND

Plaintiffs are the exclusive United States licensee of the registered Zig-Zag trademark.  (Mot. at 2.)  Defendants are Los Angeles-based wholesalers.  (Mot. at 3.)  Defendant Rajani owns Defendant New Rainbow and serves as its president.  (*Id.*)  New Rainbow trades and does business as "LA Price Check" and "Price Check."  (*Id.*)

In 2001, Plaintiffs and others sued Defendants and others for buying and selling counterfeit Zig-Zag Orange, a type of tobacco rolling paper.  See *Bolloré, S.A., et al. v. A & A Smart Shopping, et al.*, No. CV 01-02766 FMC (MANx) (C.D. Cal. 2001) ("Prior Lawsuit").  As a result of a temporary

---

[1] Plaintiffs requested to filed their Supplement under seal on February 26, 2018. (Doc. Nos. 87-89.)  The Court denied this request. (Doc. No. 90.)  Plaintiffs then filed their unredacted supplement on March 1, 2018. (Doc. No. 91.)  Docket numbers 88 and 91 are identical, except that number 88 included highlighting identifying the portions of the Supplement that Plaintiffs wished to redact.  Because docket number 91 is filed version permitted by the Court, the Court refers to this docket number as the Supplement and recognizes that it was timely filed under seal on February 26, 2018.

[2] Defendants erroneously filed their Opposition to Plaintiffs' Application to file their Supplement under seal, rather than Supplement itself.  The Court construes Defendants' Opposition as opposition to Plaintiffs' supplemental briefing regarding sanctions, rather than an opposition to Plaintiffs' application to seal the Supplement.

restraining order, and seizure and impoundment order issued in that case, Plaintiffs seized counterfeit Zig-Zag Orange products from Defendants' Warehouse. (Doc. No. 67-1 ¶¶ 12-13.) The Prior Lawsuit ended in settlement in October 2002 and a permanent injunction prohibiting Defendants from infringing on Plaintiffs' mark in the future. (*Id.* ¶ 14; Ex. A.)

Nevertheless, in 2016, Plaintiffs received a report that Defendants were again selling counterfeit Zig-Zag Orange from the same storefront, now under the assumed name "LA Price Check." (Mot. at 5.) Plaintiffs gathered evidence of five transactions in which Defendants sold counterfeit goods:

- August and September 2016: An Arizona wholesaler bought 200 counterfeit cartons for $28.00 per carton, for a total purchase price of $5,600, from Defendants. (Doc. No. 7 ("Hood Decl.") ¶¶ 10-13). The invoice from the purchase described the counterfeit Zig-Zag cartons as "dietary suppl." (*Id.* ¶¶ 14, 18.) Plaintiffs inspected and confirmed the goods were counterfeit. (*Id.* ¶ 15.)

- October 2016: A Texan wholesaler bought 400 counterfeit cartons for $10.00 per carton, for a total purchase price of $4,000, (*Id.* ¶¶ 27, 33.) Plaintiffs again confirmed the goods were counterfeit. (*Id.* ¶ 30.)

- June 23, 2017: Plaintiffs' investigator made a controlled buy, facilitated by a source, of 50 counterfeit cartons at $19.00 per carton, for a total purchase price of $950. (*Id.* ¶¶ 42-45.)

- July 10, 2017: Plaintiffs' investigator made a controlled buy of 16 counterfeit cartons for a total purchase price of $290. (*Id.* ¶ 86.) In the course of this transaction, Defendant Rajani indicated he could sell $25,000 worth of counterfeit Zig-Zag Orange to Plaintiffs' investigators in the future, but did not have that amount of product at the time of the purchase. (*Id.* ¶ 65.)

- July 21, 2017: Plaintiffs' investigator made a controlled buy of 13 counterfeit cartons for a total purchase price of $145. (*Id.* ¶ 120). In the course of this purchase, Defendant Rajani warned Plaintiffs' investigator of the risks of dealing with "counterfeit" Zig-Zag because "Zig-Zag" has undercover investigators posing as customers. (*Id.* ¶ 112.) Defendant Rajani indicated he did not have enough counterfeit Zig-Zag product to fill the investigator's order, but had enough "genuine" Zig-Zag Orange to supplement the order and would sell them for a good price. (*Id.* ¶ 115.) The investigator rejected the genuine product, claiming it was too difficult to sell, so Defendant Rajani sold him only counterfeit goods. (*Id.* ¶¶ 116-118.) The counterfeit product came from a cardboard box bearing the phrase "Made in China." (*Id.* ¶ 119.) Genuine Zig-Zag Orange is produced in France. (*Id.*)

These transactions, which Defendants do not contest, form the basis of the Court's contempt finding on February 5, 2018.

## II. LEGAL STANDARD

"A court may wield its civil contempt powers for two separate and independent purposes: (1) 'to coerce the defendant into compliance with the court's order'; and (2) 'to compensate the complainant for losses sustained.'" *Shell Offshore Inc. v. Greenpeace, Inc.*, 815 F.3d 623, 629 (9th Cir. 2016) (quoting *United States v. United Mine Workers of America ("UMWA")*, 330 U.S. 258, 303-04 (1947)). The district court may impose sanctions for either or both of these purposes. *UMWA*, 330 U.S. at 303-04. The district court is required to make a statement of its purpose or purposes underlying the imposition of sanctions for civil contempt. *Shuffler v. Heritage Bank*, 720 F.2d 1141, 1147 (9th Cir.1983).

"Where compensation is intended, a fine is imposed, payable to the complainant." *UMWA*, 330 U.S. at 304. "Such fine must of course be based upon evidence of complainant's actual loss, and his right, as a civil litigant, to the compensatory fine is dependent upon the outcome of the basic controversy." *Id*. Where sanctions serve a coercive purpose, however, the court "must 'consider the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired.'" *Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 516 (9th Cir. 1992) (citing *UMWA,* 330 U.S. at 304; *General Signal Corp. v. Donallco, Inc.,* 787 F.2d 1376, 1380 (9th Cir.1986); *Shuffler v. Heritage Bank,* 720 F.2d 1141, 1148 (9th Cir.1983)). "If the fine, or any portion of the fine, is coercive, it should be payable to the court, not [the opposing party]." *General Signal Corp.*, 787 F.2d at 1380.

5

"[A]lthough the district court generally must impose the minimum sanction necessary to secure compliance, the district court retains discretion to establish appropriate sanctions." *United States v. Bright*, 596 F.3d 683, 696 (9th Cir. 2010) (internal citations omitted). The Ninth Circuit reviews district courts' civil contempt orders for abuse of discretion. *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1130 (9th Cir. 2006).

### III. DISCUSSION

Here, Plaintiffs seek compensatory sanctions. (*See* Suppl.)[3] Their recovery is thus based on the Lanham Act, the statute from which the basic controversy derives. *See UMWA*, 330 U.S. at 304. Under the recovery provision of the Lanham Act, 15 U.S.C. § 1117, the plaintiff may, subject to the principles of equity,

> recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such

---

[3] Plaintiffs also requested a coercive sanction in their Motion in the form of an order requiring Defendants to notify their customers of the permanent injunction, this action, and any resulting contempt order. (Mot. at 2.) Plaintiffs provided no argument regarding this sanction in their Motion nor authority to suggest that a coercive sanction in the form of a mandatory injunction would be appropriate instead of a fine payable to the Court. (*See* Mot.); *see also General Signal Corp.*, 787 F.2d at 1380. Additionally, Plaintiffs did not renew the request for a coercive sanction in their Supplement. (*See* Suppl.) The Court thus finds Plaintiffs abandoned this request for coercive sanctions, and the Court DENIES it as moot.

6

amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party.

15 U.S.C. § 1117(a). "A plaintiff must prove both the fact and amount of damage. Damages are typically measured by any direct injury which a plaintiff can prove, as well as any lost profits which the plaintiff would have earned but for the infringement." *Lindy Pen Co., Inc. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir. 1993), *superseded by statute on other grounds*, Trademark Amendments Act of 1999, Pub. L. No. 106-43.

Further, under 15 U.S.C. § 1117(b)(1), courts are directed to "enter judgment for three times such profits or damages, whichever amount is greater, together with a reasonable attorney's fee, if the violation consists of intentionally using a mark . . . knowing such mark . . . is a counterfeit mark . . . in connection with the sale, offering for sale, or distribution of goods or services" in violation of 15 U.S.C. § 1114(1)(a) or 36 U.S.C. § 220506.[4] 15 U.S.C. § 1117(b)(1). Courts should only refrain from trebling damages when there are extenuating circumstances. 15 U.S.C. § 1117(b).

---

[4] Relevant here is 15 U.S.C. § 1114(1)(A), which provides,

> Any person who shall, without the consent of the registrant use in commerce any reproduction, counterfeit, copy or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any good or services on or in connection with which such use is likely to cause confusion or to cause mistake or to deceive . . . shall be liable in a civil action by the registrant for the remedies hereinafter provided.

7

Plaintiffs seek to recover Defendants' profits, Plaintiffs' lost gross profits, and attorneys' fees, as well as to treble the damages. Plaintiffs have the burden of proof as to all three categories of recovery.

**A. Defendants' Profits**

Plaintiffs provide evidence of Defendants' profits from the following transactions:

- August and September 2016: 200 counterfeit cartons sold for $28.00 per carton, for a total purchase price of $5,600, (Hood Decl. ¶ 13);
- October 2016: 400 counterfeit cartons sold for $10.00 per carton, for a total purchase price of $4,000, (*Id.* ¶ 33);
- June 23, 2017: 50 counterfeit cartons sold for $19.00 per carton, for a total purchase price of $950, (*Id.* ¶¶ 44-45);
- July 10, 2017: 16 counterfeit cartons sold for a total purchase price of $290, (*Id.* ¶ 86); and
- July 21, 2017: 13 counterfeit cartons sold for a total purchase price of $145, (*Id.* ¶ 120).

In sum, Plaintiffs present evidence of $10,985 in gross profits from Defendants' sale of goods infringing on Plaintiffs' trademark — $9,600 in 2016 and $1,385 in 2017.

Plaintiffs argue that they should be permitted to calculate the average rate of sales from this one year time period and assume that this average sales rate was continuous since December 2002 when the permanent

injunction issued.  (Suppl. At 4-6.)  Plaintiffs present no evidence that Defendants' sale of infringing goods were in fact continuous.  Instead, Plaintiffs argue that the fact there is evidence of Defendants' sales in 2016 and 2017 gives them "reason to believe" Defendants never stopped selling counterfeit goods in compliance with the injunction.  (Suppl. At 5.)  The burden lies with Plaintiffs, however, to prove Defendants' sales; mere speculation of ongoing sales is not enough to meet this burden.  *See* 15 U.S.C. § 1117(a); *see also OS Enterprise, LLC v. Fairline Development Canada (1992) Ltd.*, No. C 11-4375 SBA, 2014 WL 1389540, at *3 (N.D. Cal. April 9, 2014) ("To recover damages under the Lanham Act, a plaintiff must prove both the fact and the amount of damages.").  Plaintiffs have only met their burden for the five itemized transactions above, totaling $10,985 in recoverable profits.

### B. Plaintiffs' Damages

Plaintiffs also seek to recover lost profits.  Plaintiffs calculate this number by simply multiplying the number of cartons sold by Defendants by the price Plaintiffs would have charged per carton.  (Suppl. at 5-6.)  Because Plaintiffs are already capturing Defendants' profits, calculated above, their lost profits should be the difference between the amount they would have charged per carton and the amount charged by Defendants, multiplied by the number of cartons.

According to Plaintiff National Tobacco Company, L.P.'s Manager of Product Integrity, the lowest available wholesale price per carton was between $30 and $34 per carton in 2016, averaging $32 per carton.  (Doc.

No. 9 ¶¶ 4, 45.)  As detailed above, Defendants sold 600 counterfeit cartons in 2016, which would have amounted to $19,200 in gross profits for Plaintiffs.  Plaintiffs thus lost $9,600 in profits in 2016.

According to the Vice President of Finance at Plaintiffs' parent company, Turning Point Brands, average price per carton in 2017 was $23.46 (Doc. No. 91-1 ¶ 5.)  As detailed above, Defendants sold 79 counterfeit cartons in 2017, which would have amounted to $1,853.34 in gross profits for Plaintiffs.  Plaintiffs thus lost $468.34 in profits in 2017.

In sum, the evidence supports finding Defendants' infringement caused $10,068.34 in Plaintiffs' lost profits.

**C. Treble Damages**

Plaintiffs seek to treble the damages under 15 U.S.C. § 1117(b). Judgment was already entered against Defendants for violating 15 U.S.C. § 1114(1)(A) in the Prior Lawsuit.  (Doc. No. 67-1, Ex. A.)  The evidence set forth in support of Plaintiffs' Motion clearly and convincingly showed that Defendants' violations of 15 U.S.C. § 1114(1)(A) continued, despite the permanent injunction prohibiting them from engaging in such sales and distribution.  Treble damages is thus appropriate here.  Equitable considerations similarly favor trebling the damages because Defendants' infringing conduct was willful, as was apparent by Defendants' explicit recognition that their goods were counterfeit.

Thus, the Court multiplies the sum of the damages here — $21,053.34 — by three, to come to a final sanctions sum of $63,160.02 awarded to Plaintiffs as a result of Defendants' infringing activity.

**D. Attorneys' Fees**

Under section 1117(a), the Court may award reasonable attorneys' fees to the prevailing party in "exceptional" cases. "While the term 'exceptional' is not defined in the statute, generally a trademark case is exceptional for purposes of an award of attorneys' fees when the infringement is malicious, fraudulent, deliberate or willful." *Lindy Pen Co.*, 982 F.2d at 1409 (citing *Sealy, Inc. v. Easy Living, Inc.*, 743 F.2d 1378, 1384 (9th Cir. 1984)). "Willful infringement carries a connotation of deliberate intent to deceive." *Id.* at 1406.

Defendants' conduct here was willful; Defendants do not argue otherwise. Defendants were explicitly and permanently enjoined from infringing Plaintiffs' mark and nevertheless sold counterfeit goods bearing Plaintiffs' mark. Further, the evidence from the controlled buys that Plaintiffs presented in support of their Motion indicates Defendants were aware their goods were counterfeit through their efforts to disguise their sales. For instance, Defendants (1) described the counterfeit goods as a "dietary supplement" on an invoice instead of as Zig-Zag products, (Hood Decl. ¶¶ 14-18); (2) refused to provide receipts for sales, (*Id.* ¶¶ 86-88, 120-22); (3) sold Zig-Zag products at notably below-market prices, (*Id.* ¶¶ 44, 86, 120); (4) sold products from boxes bearing Chinese characters when Zig-Zag

11

products are made in France, (*Id.* ¶ 119); and (5) referred to products he was selling as "counterfeit" during a controlled purchase, (*Id.* ¶¶ 110-17).

The Court therefore finds that an award of attorneys' fees and costs is appropriate here. Although Plaintiffs' counsel provides a ballpark estimate of the fees and costs associated with this Motion and Supplement, (Suppl. at 8), the Court requires itemized billing in order to award attorneys' fees and costs. Thus, prior to awarding fees and costs, Plaintiffs' counsel must submit an itemized invoice.

## IV.  CONCLUSION

For the reasons stated above, the Court ORDERS Defendants to pay $63,160.02 in compensatory damages to Plaintiffs, as well as attorneys' fees and costs in an amount yet to be determined. Plaintiffs shall submit an itemized invoice of their fees and costs associated with this Motion and Supplement by April 6, 2018.

**IT IS SO ORDERED.**

Dated:  3/27/18

Virginia A. Phillips
Chief United States District Judge